Good morning, Your Honors. My name is David Baggy from the firm Amberson Dreidler in Boston and my colleague Debra Christensen from the firm, given its courtesy, from Boise, Idaho. We represent the plaintiff and felon SilverWing at Sandpoint in this matter. We are here, Your Honors, because the district court made two fundamental errors in its decisions below. First, it made a fundamental error regarding the scope of preemption in federal deviation matters. In some local airport sponsors, like Bonner County here, choose the type of airport that they want. Specifically, they choose the design category of aircraft they wish their airport to serve. Then, given that choice, the FAA determines the safety standards that are applicable to that type of airport. Here, this court can only affirm the judgment below if it concludes that the FAA could somehow force the county to upgrade its airport to B-2 design standards, even if the county decided that it didn't want to. And I will argue the FAA simply does not have that power. Secondly, Your Honors, the district court made a fundamental error when it prematurely declared the county the prevailing party in the litigation. It awarded the county nearly $750,000 in costs and fees, even though the case wasn't over. The trial did not yet occur on account for SilverWing's claim for promissory estoppel. And as we now know, on the way down to state court, based on our supplemental submissions to the court, SilverWing won more than a million dollars in damages and costs. The attorney's fees also defeated four counterclaims that the county had brought. So I want to focus, if I might, on a specific facts issue here. The district court concluded, Your Honors, that the FAA had ordered the county to address three separate compliance issues in a way that was disruptive of SilverWing's development. First, the district court concluded that the FAA had ordered the county to address SilverWing's rights, as well as the rights of other neighbors to SilverWing to the west of the airport. Their rights to access the runway at its midpoint, as opposed to access the runway in the instance. Second, the district court concluded that the FAA had supposedly ordered the county to address the fact that SilverWing was proposing a residential development adjacent to the airport with access to the runway through a fencing route. And then the third issue was that the district court concluded that the FAA had supposedly ordered the county to upgrade its airport to so-called V2 design standards. What the district court missed, Your Honors, is that two of these three issues of non-compliance were addressed to the FAA's satisfaction before the events in late 2011 triggered this lawsuit. Mid-field access turned out to be the easiest issue. FAA was satisfied with the county's representations in January 2009 that it was going to work with SilverWing, and it was going to work with FAST, which was one of SilverWing's neighbors to the west of the airport, to try to work with those entities to find alternatives to the mid-field access for operational, at least operation protocols that would address that problem. The residential-through-the-fence component of SilverWing's project, which was an issue, no doubt about it, we don't dispute that, was cured in March 2011 when the FAA, as the county acknowledged, completely shifted course on residential-through-the-fence. It allowed existing residential-through-the-fence access to the Houston's airports. That problem went away. The third issue, Your Honors, is the one that I'd really like to focus on today. This is a supposed requirement imposed by the FAA that the county upgrade its airport to B-2 design standards. In the week 2011, again after the FAA had modified its rigid approach toward the residential-through-the-fence agreements, the county could have decided to abandon its plan to upgrade the airport to B-2 design standards and leave the airport in a configuration that would have been consistent with SilverWing's development. That didn't happen. Instead, in December 2011, and this is the event that triggered this lawsuit, the county chose to submit an amended corrective action plan to the FAA that reflected the county's determination to proceed with its upgrade, to move the runway, to move the DMC runway, and to basically acquire, in the amended corrective action plan, some or all of SilverWing's development. This public statement by the county destroyed SilverWing's ability to market its units and cost SilverWing millions in damages. That was the action that triggered this lawsuit. Mr. Coordinator, do you want to conclude that that action, the amended correction plan, was ordered by the FAA? No. Did the county just ignore it? Did the county just ignore the, well, what we say is the county had a choice about what type of airport it wanted to build. And it submitted an ALP back in 2003, as the court knows, which is largely the subject of the state court trial, that reflected an upgrade to B-2 standards. Our position is, Your Honor, we think federal law is clear. We think the FAA's approach to these issues are clear. It's that the county, even though that development was shown on an approved ALP, the county had the ability to change its mind. And your side didn't want to do it. Let me go back to the theory of your case. It's what you allege your support. Right? I'm sorry. In the complaint, in the federal complaint, you have a cost of action for breaching, it says you can breach a contract. That's correct. Count one. Count one is for breaching the duty of good faith in a fair case. That's correct. Right. Which contract are we talking about? Where does that duty, where does that duty to the facts remain when it comes to tax evasion? Okay. And the other two claims were 1983 claims, based on the taking theory of corrective taking, so you were taking more action than the fourth claim, which was to stop a claim in the district court or an independent state court. That's correct. Those were the other three claims. Okay. Why does the first claim involve safety and operations in this airport? Okay. What category of airport is this? Why isn't that in play here? As I described at the beginning, the only issue that wasn't assured was this issue that the district court felt that the FAA had ordered the county to upgrade to B-2 design standards. That was not a determination about, gee, the airport doesn't comply with the FAA order standards applicable to any type of airport. It was the decision that the county made about that kind of airport that it wanted. Now, we absolutely agree that once the county chooses the type of airport it wants, it wants to accommodate an aircraft in the so-called B-2 design category. The FAA is all over that. There are a number of safety standards that get applied to that particular type of airport. But the decision about the kind of airport that the county is going to use. What is it that the county did that violated its duty of good faith and fair dealing? Submitting a corrective action plan. I meant a corrective action plan for like 2011. We should trust it to be a commitment to B-2. So if you were going to trial on this good faith and fair dealing claim, the theory, the factual presentation that you would make is that the county submitted this amended corrective action plan. That's correct, Your Honor. And it required, why was it in bad faith? Or was it in good faith? Well, it was completely inconsistent with the three defense amendments that the county had signed that would have permitted this development to go forward. So your theory would be that they didn't have to do that amended corrective action plan? Absolutely. No, no, they should have done this. Just maintain the status quo. That is absolutely our theory. The county had a choice, in other words, whether it was deciding not to do the upgrade, leave the airport in its current configuration, so avoid its development, proceed as planned, or persist in its determination to do the upgrade. And as a result, obviously, they have to take a series of actions that would destroy civil rights. So you're talking about an amended corrective action plan. There was an earlier corrective action plan. That's correct, Your Honor. Back in late 2008. And how about the original corrective action plan? This caused concerns that they had raised with respect to midfield access or distance in the residential through the fence access. That's correct. And then in 2009. Your Honor, you don't have to complain about that. No, Your Honor, because those are no longer issues. Those things are no longer impediments to civil rights moving forward because the FAA was satisfied with the approach to midfield access. And as a regulatory matter, the FAA changed its course on the residential tennis courts, for instance. So the heart of your first comment, actually, your first point, Your Honor, is that they submitted, the county submitted, this corrective action plan in late 2011. That's correct, Your Honor. When they didn't have to. That is correct. When they did, when they violated their duty of complaint in 2013, they just had to do it. So does the FAA require them to file a corrective plan? The FAA did not require this. The record is very hard to decipher with respect to whether a corrective action plan at some point was required at that point. But there is no question, Your Honor, that the county did not have to take the particular actions in that amended corrective action plan that triggered our lawsuit. In other words, the upgrade to B-2 design standards and then the acquisition of our property. That amended corrective action plan, I should point out, it basically says we are going to acquire and distinguish the solar wind development. And that was action that it did not have to take. And I should say here, as subsequent events developed, the county ultimately went to FAA way too late to save the damage to my client. Ultimately, it did go to FAA, as the court knows, based on the supplemental submissions we made. It decided that it no longer wanted to do the B-2 upgraded hazard. And, you know, the county has now represented repeatedly that the airport remains now in a configuration that is consistent with solar wind development. But in the meantime, the delay damages are extraordinary. So the issue here is whether under the FAA regulations, as they existed in 2011, the county was obligated, in order to get permission from the FAA to build this airport, to submit the corrective plan. And we submit, Your Honor, that with respect to elements of the corrective action plan that damaged our county, the county did not have to do that. The county did not have to upgrade this airport to B-2 design standards. It didn't have to remove the runway. It didn't have to acquire our property. So let me speak briefly to counts two and three, Your Honor, which are the civil rights claims. The district court dismissed counts two and three on state action grounds, effectively. And it seems... It wasn't state action grounds. It was getting rid of a customer policy. That's entirely distinct from state action. There's no dispute here that state actors were involved. That is obvious. On this long-standing customer policy that the county and the district court concluded that solar wind had to show, in our view, the Pembauer case, disposed of that Supreme Court case from 1986, gives it clear you don't need... When you're talking about an act of the officially, you know, municipal policy-making body, like you are here, the amendment to corrective action plan was signed by every one of the county commissioners. When you're talking about that, it just takes one. It doesn't have to be a long-standing, frequent, repetitive course. That's what we submit the district court here to concluding otherwise. The district court also concluded that, well, it's not really an act of the county here in terms of the upgrade to the airport, because the FAA is on page 28 of the court's opinion, because, really, the FAA forced the county to do the upgrade. There was an FAA letter in the FAA regulations requiring changes to the airport. Is the letter you're referring back in March 2009? Yes. I'm sorry, yes, March 2009. Yes, there is a letter written by... I want to talk about that letter for a minute, because there was a letter written by an engineer in the Seattle Airport District Office that said, you know, in effect, county, there is an approved ALP back here in 2003 that reflects the need to do this upgrade. And the plans you just submitted to us are inconsistent with that. And here are, as we submit, if you read that letter in isolation, it appears that the FAA is attempting to push this upgrade onto the county. But that letter can be used by the county to remember three years later. The county submits the corrective action plan in March 2011. In our view, does the county really thought  three years previously was going to force the county to spend its scarce resources to upgrade an airport in order to decide it didn't want to? The county needed to check back with the FAA as to simply deny reasonable interpretation of that three years ago. Has there been any correspondence or regulations in the meantime from the time that that engineer wrote a 2009 letter and said, this letter is no longer operative? No, the record is void of any effort by the county to... So why is there some theory that the passage of time changes the effect of the letter? There are a number of factors. Is the author of the letter an engineer who's had a radio as the passage of time three years? And then frankly, it's just absolutely inconsistent with A, the powers that FAA has under federal law to come up with... I think you're missing some of the realities of a bureaucratic state, which is the county sees a letter from the FAA saying you should do these three things, and you're saying, well, we should have disregarded that, because in our analysis, that man wasn't really authorized to do it. It's been three years in between, and the county should just say, we're going to piss off the FAA? That's not the way the bureaucrats work. No, I understand your point. We're not suggesting for a minute that there's any effort to piss off the FAA. Under any circumstances, it's a lawyer for airports who never piss off the FAA. Our response is that that letter is for flouting the power of the FAA's part. The FAA itself doesn't even think it has. The FAA can't force the county to spend money at the airport as opposed to someone who is using it. So we're taking steps to take the county to say, listen, county, don't pay any attention to the FAA letter anymore. These are all the reasons that you shouldn't do so, and we want you to write a letter to that effect. The record very clearly reflects, Your Honor, that at this point, Silverwood and my client was very much biased on the conversation to the FAA relative to the FAA. I'd like to deal, as I might have available to you, these fees issue, again, the error that the district court made in really two of those respective fees. First of all, prematurely declared the county the prevailing party for purposes of costs. But even the federal court actually wouldn't deny it was the prevailing party. Well, with the claims that remained in federal, there was nothing left in federal court once the court took back the fourth claim. There was nothing left. Your Honor, all of the cases that the county cites from the San Diego case that it highlights in its brief, in all of those cases, all of the claims before the district court were dismissed. And that was the end of it. And Silverwood went back to state. It was no longer a solvable claim in federal court. Over and done with. Out of the claims that remained, the county prevailed, right? But count four, the fourth count of Silverwood's complaint in federal court is remanded to state court. And then there was a lot of activity in state court. And as Ms. Christensen knows, the county then filed four counterclaims and lost on all of them. Silverwood prevailed in front of the jury on the promissory estoppel claim. And this case is simply misquoted for the claims that remained in state court. That's correct. What happened in state court, on a claim that Silverwood was part of the original claim. No, that claim originally started in state court. That's exactly right. So a number of the cases talk about how well the defendant prevailed here, even though some of the claims were dismissed with opportunity, without prejudice. But at least the defendant has been freed of the burden of litigating in federal court. Here, that's not a consideration. Silverwood brought all four counterclaims in state court to begin with. That's where it brought them. They got them removed from federal court. The judge then exercised his discretion to send count four back to state court, where Silverwood rang it up. If the judge had exercised his discretion to dismiss the claim, there would have been no ability to report it. In the state case, could you have proven the attorney's fees, which they're seeking now in the federal case, as an item of damage? In the state case, could you? But it's an element of damage. Why not? No, I don't believe so. If you're saying the promissory statement caused all this damage, among the damages that it's caused is losing the federal case and losing attorney's fees in the federal case. We did not make that claim. You remember? We did not make that claim. I remember. Because we believed we had recourse with respect to the costs award in federal court by challenging it. We thank you for the class award. One more issue, if I might, Your Honors, with respect to the attorney's fees award is the district court's suicide award to the county and its fees for defending the two silver rights claims. The county argued below that it was entitled to recover its costly fees for defending count one, which included the three defense agreements. The district court, on its own initiative, granted the county fees, not only for that claim, but also for the two silver rights claims. When we came back in the second round of briefings, we never had a chance to address that issue. The district court raised its response. The district court then said, well, I'm going to treat this as a motion for reconsideration and hold you to the extraordinary circumstances testing your rules HDB and your request for release this time. We never had a chance to address that issue before the court ruled on it. So what we are requesting here, Your Honors, is a reversal of the district court's decision. But if the district court's decision is affirmed, a remand to the district court to wait to see how the state court litigation ultimately turns out as an LMP to the Idaho Supreme Court. And then if, at the end of that, the district court in its discretion still determines somehow that the county is the prevailing party, at least an instruction that the award of fees on the through defense agreement for the defense of the civil rights claims which was landing outside the scope of what Section 14G required of the law, that you're off to a greater time to pursue the remand. Thank you, Your Honor. Good morning, and may it please the court. My name is Paul Friedenberg with the Buck Culture Law Firm for Bonner County. And joining me at counsel's table is my colleague Barbara Lichman. Thank you. I can only respond to this new twist about the 2011 corrective action plan with Judge Bea's favorite Italian saying, Sennone vero evento provato, which means, even if it's not true, it's a good story. And that's really what this is. There is nothing in the record, Your Honors, nothing that shows an intervening event before, sometime before 2011, where the BFAA says, hey, call off the dogs. We don't need to intervene in these claims. But that didn't happen. And to answer Judge Bea's question, does the county still have an obligation in regards to the passage of the time or leave behind its obligation to comply with federal law? Of course not. This is the directive of the Federal Aviation Administration. The statement that counsel made was, the county had a choice. That is particularly disingenuous in light of the facts of this case. How does the B2 status appear that the county's desire to have a B2 airport has been fulfilled? The county is a good question. The county didn't desire for a B2 airport. In fact, what we have in the record on page 257 is a letter, and it's from the FAA, and it says, we are concerned that Silver Wing's development, specifically their newly constructed partial parallel taxiway, was constructed in accordance with your 2003 approved ALP. Sorry, was not constructed in accordance with your 2003 approved ALP. Rather, it was built based on your proposed plan to keep the runway at its existing location. That's the county's choice. The county chose to keep the runway where it was, not to go to B2. That was the county's choice. This is what they say. Although there was no objection to the partial parallel taxiway construction at the time, for the reasons stated in the letter and the need to bring the airport up to the required B2 design standard, as shown on your approved ALP, we, the FAA, cannot accept the proposed ALP change. That was the county's, the county had a choice. I mean, that's disingenuous. That was the county's choice, was we don't want to move the runway. We want to accommodate Silverman. They got this in response. That was the plan, right? If we're talking about one ALP, I mean, the moving force. So what you're saying is that the FAA understood the development to desire a B2 standard at the airport? No. Design of critical aircraft standards for the airport aren't actually even, well, how can I put this? Neither the county nor the FAA wakes up one day and says, we choose this design or critical aircraft. Instead, it's done by a B2 standard. If you look at the supplemental excerpts of the record, page 85, this is what it says. This is the advisory circular issued by the FAA, 150-5300-13A. It says, design standards. For the purposes of this advisory circular, the selection of the design aircraft or group of aircraft characteristics used to design or update an airport facility is independent of, and then the first factor it says is airport ownership. It's independent. We don't get to select what design standard. It actually is based on current most demand and use of the airport. So if you've got Gulfstreams flying and they have a certain wingspan and approach speed, but then overnight, all of a sudden, you've got 737s flying. There's a change in the use of the airport. Then what we do is they look at what is the current critical, the most demanding, now it's the most demanding is the 737. And they say, how do we need to change the airport if necessary to accommodate that demand? That is a pure safety determination. I can see there's 100% split here. The county didn't want to do that. No, the county didn't want to do that. I'm speaking of the record. That's page 257 of the record. We reject, and I can, page 174 of the record, you'll notice is another airport layout plan. That's the 2006 airport layout plan. What you'll notice about that is as non-aeronautical into the years, it's difficult to notice anything when looking at one of these airport layout plans that you may have discovered. But one thing you can notice when you look at that one, that's the 2006 airport layout plan that was submitted by the county to the Federal Aviation Administration. The one thing you notice about that is you'll see two boxes in the middle of the document. One of those boxes, the one on the bottom, the larger one, is where the FAA is supposed to sign. They have the final approval power. That box is empty. That box is empty on that document because they refused to sign it, and they sent this letter and said, you're only going to have to submit an airport layout plan that shows operating to P2 Design Center based on these objective criteria. That's what the county was dealing with in this case, and the idea that it was, the county has a choice. I mean, it is, it's disingenuous. That's not the facts of this case. The portion of the record that completely rebuts the council's argument is from ER 0250 to ER 0267. That's the 17-page portion of the record that just completely explains the driving factor in everything that happened here was the county's too broad a car place. We're trying to write by silverwing, to write by everybody on the airport. So I just don't understand their breach of contract, breach of the applied duty. Could they be fair dealing to be on the memo? I understand it to be about access to the airport because they're looking at two things. They're saying that it's the implied covenant in their true defense agreement, and the implied covenant in their easement, which provides access. Now, that was a specific, I mean, if you go to that part of the record that I just mentioned, that's one of the primary problems that the Federal Aviation Administration had with silverwing development is they didn't like residential access, and it actually took an act of Congress in 2012 to grandfather in residential access, including in this case, it grandfathered in section 136 of the FAA Modernization Reform Act 2012. So to say that's a local decision. It took an act of Congress to grandfather their access. The county didn't unilaterally, there's nothing in the record showing the county unilaterally said, we don't think there should be access for residential anymore. It all came from the federal government saying there's a safety problem on your airport. And the second they say that, if you're a federally-automated airport, the second the FAA says safety, you listen. You don't say, well, they said that in 2009, and now it's 2011, so, you know, we can submit a different plan. But I will tell you this. The record is also clear that the county never stopped pursuing its choice, to keep the runway where it is. What it wanted to do, it never stopped pursuing that. So it jumped through the hoops, and it submitted a corrective action plan. FAA said if your corrective action plan is not good enough, submit a corrective action plan with X, Y, and Z. The county responded, okay, here's a new one with X, Y, and Z. But during this whole time, the county continued to try to get the FAA to come around to a position of understanding, we don't want to move this runway. That only ended up eventually happening in 2015. And now, Silver Wing's development is undisturbed. You know, this business about tearing up their taxiway, that never happened. Their taxiway's right where it was. The runway's right where it was. You know, there has been that. What I'm reading from the material is that the county wanted this development. No, but then that's the choice that they've put on it in this case. It is absolutely not correct. The county did not want an upgrade to a B2 design. It was a planned unit, though. Oh, no question about it. No question about it. I think the Silver Wing's development for the county represented something that was an interesting sort of pro-aviation idea. And this is a spot, and I've been to this airport a number of times. I've walked in the taxiways. This is a small airport. There's not much going on out there. You know, there's a train that blows through about every 20 minutes and wakes everybody out. So maybe not the best spot for a residential development. But, no, the county was on board with this from the start. It still is. You know, I mean, to the extent that the federal government will allow it, which now the ducks in a row have been knocked down and the federal government is saying, this is okay, right? We got our FAA modernization reform act of 2012 gotten through the fence. That's no longer a problem. We got our approved AFP in 2015. It's no longer a problem. It's not moving against the internal plan. So, again, the idea that the county could choose the kind of airport it wanted while the county didn't choose and the FAA rejected that in that letter that I just read. I think that's what gets to, you know, counting the ER on the other page. Yes, that is ER 0257. Council's response with respect to the section 1983 claims. It goes to Pembauer. Pembauer is the best possible case for the county's position because, and my only regret is I didn't cite it before council did. Pembauer says, quote, we hold that municipal liability under section 1983 attached to where and only where the deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. That is a direct quote from Pembauer. The letter that I read to you. Although there was no objection to the partial parallel tax way at the time for the reasons stated in the letter and the need to bring the airport up to the required B2 design standard as shown on your approved ALP, we cannot accept the proposed ALP change. The county can't have a policy sufficient to satisfy the Monell standard on this issue. On every other, I mean almost every other possible issue that the board of county commissioners could vote on, they would satisfy that Pembauer, right, any of these local issues of local ordinance, that they are the final governmental authority with respect to the subject matter at issue. But when it comes to these questions at issue in this case, it's not disputable. They're not the final governmental authority. And not on the law, but also not on the facts of the case. With respect to the preemption claim and the good faith of fair doing, comments of good faith and fair doing, the 9th Circuit is sort of the leading jurisdiction when it comes to other courts looking in at how these safety issues have been interpreted in the terms of preemption. The judge found that it implicated the complete and exclusive sovereignty of the Federal Aviation Administration through implied field preemption. And that's absolutely right as a matter of this circuit's law, but I would go even higher, right. I believe in the words of the Constitution, and it's a supremacy clause that says federal law is the supreme law of the land. We have an Act of Congress 49 U.S.C. section 40103 A and B says the Federal Aviation Administration shall have complete and exclusive sovereignty over the navigable airspace and the safety in the air and of people and property on the ground. It's completely preempted field if as the FAA concluded this is a safety issue. So access and to give you some insight, your understood insight into what the FAA's problem is, or was, with residential through the fence is that unlike commercial through the fence where you'd assume probably a fairly regulated and sophisticated group that can go through the fence, the FAA was concerned at the time about, you know, what if you're coming in to land the plane and there's a key walking his dog on the runway. That's the legitimate concern that raised these residential through the fence concerns. Now, they collect a lot of comments in the rulemaking process and they determined that in some situations, they should grandfather it in because it's an existing right that's been granted. The other thing the Hembauer case says, and it's admittedly a footnote, but it's or it's explaining the whole, you know, Oklahoma City versus Tuttle. It's in five of that opinion. What it says is that after a municipal policy or custom has been established, that it only takes one unconstitutional act in furtherance of that policy to you know, allow for municipal liability under 42 U.S.C. Section 1883, but it still takes one. So, I, you know, we still have an answer from from counsel and from appellant regarding we have a policy or custom from the federal government we are implementing, we're doing what the federal government is telling us to do. That's clearly the moving force. I mean, that's the language Mahal uses. What is the moving force? That is clear in the record. And so even if we say, well, yeah, sure, but it doesn't have to be long-standing, that doesn't, Hembauer doesn't support their case. There's been there's been no pointing to an action in furtherance of some local desire or policy or custom on the I filed a motion to finalize a judgment under Rule 58D Federal Rule of Civil Procedure. I had one on three claims. I had one claim remanded, not based on the lack of subject matter jurisdiction as the briefs from Appellant suggested, but based on the district court deciding in its discretion that it didn't want to exercise supplemental jurisdiction over the city law issue. I filed a motion under Rule 58. They filed a notice of non-opposition. That's my motion of settlement to show that what the judge then did is what both parties asked the judge to do, which was issue a final judgment on the three claims on which the county prevailed. I had 14 days under Rule 54. I had 14 days to submit for prevailing party cost fees. They filed a notice of non-opposition to the very item. It gave me a 14-day limit to submit for cost and fees. There's been no suggestion by counsel as to some alternative way that a district court judge I mean, I don't know if counsel's proposing that the judge's law should have waited two years and watched the promissory estoppel come from afar and determine what the state court did with it before determining. I don't know. I don't see a procedurally doable way for a district court judge to do anything other than precisely what the judge did in this case. The county was entitled to its costs under Rule 54 by prevailing on all three claims in that judgment. And finally, with respect to the defense agreement and the fees, the attorney's fees issue, the contractual attorney's flaws in this case was as broad as can be. The words are, quote, any action brought, right, to enforce or interpret in terms of this contract. Well, if we look at the first medical claim, the charging allegations of those Section 1983 actions, of those Section 1983 claims, are very clearly directed at the access issue. And that's been Silverlee's complaint since the beginning. So, is this any action brought to enforce or interpret the terms of that agreement? Of course it is. This is an action that they brought for that purpose. Well, it's not so much to enforce the agreement, it's just to vindicate a violation of the county's constitutional rights. It's okay to look at a county by that level. Silverlee's constitutional rights is a good question, but I think we have to look at what constitutional rights we're talking about. How did they get access to some of their even projections? One of their claims was whatever, I don't know if I understand the theory, but they had a theory about their right to even projection construed was violated by someone, what the county did. And they had a theory of killing themselves. It's a good question, although I don't think it had anything to do with killing themselves. But that was their constitutional system, and they didn't enforce it. That's correct, Your Honor, and I'll answer both of those. Excuse me, but I don't know what is the answer to that, Your Honor. And I'll answer both of those separately, if I may. First, with respect to equal protection, what they did was they said, if you look at the others with mid-field access on the airport, there's the keyword access, those others haven't been treated the way we've been treated. So we're a class of one, or we're being treated differently, that's about what their equal protection claim is. But only, right, the predicate for that is that you have a right to access, and that's the racial equivalent of professing it. That's what they're saying. On the infestation claim, what they were saying is they're not claiming that we are, you know, they're claiming that by removing access to the property, right, if they no longer have it, and this is in the charging allegations, they mentioned the access, their value of their property, right, essentially becomes not what they intended it to be. How can you have an airport that's fly-in, fly-out community if you can't fly-in, fly-out and taxi over to your residence and park it under your residence, which is what they're proposing. At the very heart of the coastal claims is the access issue, and they don't have a right to access without that sort of defense agreement. So is it brought to enforce or interpret the terms of that agreement? It is. It's brought to enforce the right that was granted. Absolutely. There's this particular action was brought to indicate a right that they didn't have without that agreement. So it's to indicate something that's access, right? Not any member of the public has a contractual claim that they can have in 1983 case. If their only claim was a contractual claim, they wouldn't have. Oh, well, you know, the way that they chose, they chose Section 1983 as a vehicle for enforcing that access right, and specifically, Your Honor, for the value of their property, well, it's an interest combination because the value of our property has been taken from us without access. So, you know, well, you're now selecting Section 1983 as the vehicle for recovering what you claim you've lost as a result of losing that access right. That access right is a right that was granted in the privilege agreement. Okay. Thank you, Your Honor. Thank you, Your Honor. Yes. Yes. There is no ambiguity about FAA's use of its own power to compel an upgrade in design standards. I just want to refer the Court to page 26 of our brief where we cite FAA Order 5196B as well as an advisory circulator and it says, this is the FAA Order, a sponsor, through preparation of an FAA-approved ALP, may determine the level of design standards for new construction, that is, the aircraft design category of the airport. The ALP is the airport owner's plan for development of the airport, and although we, the FAA, have a significant interest in it, the FAA does not own the airport and should not attempt to dictate what development is shown on the airport. But it's not just FAA, it's Village Advancement Bill, which we cited through our briefs, and it's also, we submit fundamental principles of federalism that the FAA cannot compel a county to upgrade an airport if it doesn't want to. With respect to the attorney's fees issue, Your Honor, I just want to say it's not only a substantive flaw. If the through defense agreement had said you can get fees in any action relating in any way to, that may be a point, but this one is quite narrow as actually to enforce or interpret, and that's just count one. Also, we never had an opportunity to argue this, which I think is a fundamental procedural flaw that in and of itself warrants remand on the fees issue. Thank you very much. You're welcome. Safe travels. We appreciate your arguments. Thank you.
judges: Paez, Bea, Lamberth